Good morning, Your Honors. My name is Alexander Silverduff. I'm with the Federal Public Defender's Office, and I represent Mr. Gabriel Bucher. I'd like to reserve two minutes for rebuttal. All right. Please watch your time, counsel. Thank you. Your Honor, while the facts of this case and the outcome of the case are relatively minor, it's simply an individual who was instructed not to proceed back down a national park trail when the national park rangers were going to investigate an individual who was walking out of the park. And instead, he went back down the trail, and as a result, he was convicted under 36 CFR 2.32. Well, he did more than go back down the trail on this record, didn't he? Excuse me? You're stating the question that we must review, and you said he went back down the trail on this record. He did more than just go back down the trail, didn't he? I disagree, Your Honor. He disobeyed an order. That's for sure. The ranger told him— No, we're talking about his actions. Your Honor, the— Did he do more than go back down the trail? You can answer yes or no. Yes. He went back down the trail, and he spoke to the individual who was going to be investigated. However— Did it differ from just going back down the trail in your view? Well, not exactly, Your Honor, because the testimony that was presented was that, number one, no one knows exactly what was said between my client and the individual. Well, unless the government presented the testimony of the individual who Mr. Booker was talking to, which happens in criminal cases all the time, they present co-conspirators or someone else to testify. In other words, you're suggesting that the person accused of a crime is going to come and cooperate with the person who accused him? No, Your Honor. He was the person who was supposedly involved in having possession of the drug, isn't he? That's correct, Your Honor. And so can't one who is a tri-effect look at the conduct and decide what he was told? That's correct, Your Honor. And isn't it somebody, the tri-effect, the person who decides what inference is reasonable? That's correct, Your Honor. And what did he do? Well, all that happened here, Your Honor, the evidence that was presented— What did the man who he spoke to do? What that individual did was when the park rangers proceeded back down the trail and when that individual saw those park rangers. And mind you, before he saw those park rangers, he had been talking to my client. He had not walked around. He had not turned away. He had not done anything. And there was plenty of time for that individual, if he had actually been told that they were coming to arrest him and he wanted to obstruct that investigation, to have done something. That's one argument. But that's not the only thing that could be inferred. What did he do? Did he faint? He then, when he saw the park rangers, he fainted. The testimony then was— Excuse me. He fainted. Did he actually faint? Well, that's in dispute, Your Honor. Because the park rangers testified. How is it in dispute? They took him to the hospital. They did everything. They hauled him out of there. And there's just no doubt on this record. He pretended to faint. Well, I disagree with that, Your Honor. The park ranger said that—he testified that later, three hours later, after he had fainted, he had been unconscious, taken away in a stretcher to the ambulance and to the hospital. Three hours later, someone informed him, who wasn't subject to cross-examination, that they believe he faked it. That's three hours later, after he was unconscious and taken away in a stretcher. And that's the testimony of the park ranger. To see you overstate the facts, you mean after he was taken away in the stretcher. He was taken away in a stretcher in an emergency. We can't say on this record that he was unconscious. You suggested that's the question. I believe that is in the testimony, Your Honor, when the park ranger testified as to what happened. He appeared to be unconscious, and they called for additional help based on the fact that they believed he fainted. And then three hours later, the testimony was he regained consciousness, and that's when they determined he was supposedly faking it. That's the testimony, Your Honor. Go ahead. Your Honor, even if you wish to infer— We don't wish to do anything to reach the right results on the case, and all I'm trying to do is get counsel to state the case. You said he walked back down the road. I ask you, did he do more than that? You said no. Well, Your Honor, still— My honor, it hasn't slipped that far. Still, from the evidence, I don't believe that there's any reason to inference that the fainting done by that individual was caused by what my client said to that individual. All right. That's your belief. But a triad fact has to be— He has to make reasonable inferences beyond a reasonable doubt, Your Honor. And I would submit to you that that is not a reasonable inference that can be made from that discussion, beyond a reasonable doubt, considering all of the facts that were made that were testified to. Because he didn't do anything to escape. He didn't walk back down the road. He did nothing until he saw the park rangers, and then he fainted. There's no evidence whatsoever that my client said or did anything to that individual to cause him to, if you want to even infer that he faked it, to fake being fainted. Let's assume that he fainted. Let's assume on this record he fainted. What—if he didn't know what the rangers were coming for, what would cause the sight of the rangers to call it causing the fainting? He had seen them before, hadn't he? Because, Your Honor— Had he seen them before? He had. And he knew he had lied— Did he faint then? Your Honor, he knew he had lied to the rangers the night before. He knew he had drugs on them, and he knew he might be in trouble. He knew those things when he walked out of that trail. And when he sees the park ranger coming down the trail for him, that is something he knew. And therefore, he had all the knowledge he needed to do what he did, which was either to fake fainting or to faint. This is a 78-year-old individual who just marched four or five miles out of the camp. You'd be surprised at how young that thinks 78 is. I understand that. I'm not thinking—you know, I'm not so young myself, Your Honor. But even the park ranger testified that it would take a healthy person in medium age four or five hours to hike out of there. And he hiked out with everybody else, including my client, who was very young. And he knew—he possessed every piece of information he needed to know to know that he was in trouble, without one word being said from my client. And without any linkage between what my client said—in fact, there's negative linkage. He didn't turn around and walk away. He didn't do anything when my client had all that time to talk to him. He did nothing. He only did it when the park rangers walked out and he saw them, possessing the knowledge that he already did. And that is not a reasonable—and we would submit it's not a reasonable inference. But beyond that, Your Honor, I would cite you to the very case the government cites, which is United States v. Buehler, which cites United States v. Bryce, which is a Ninth Circuit case. And what that case says, Your Honor, is that—and this has to do with sufficiency of the evidence— is that under the regulation, it is not enough that a defendant created a situation which interfered with the performance of the park rangers. It has to be an intentional interference. So the fact that he walked down the trail and spoke to this individual, and as the rangers testified, well, then we thought we might as well walk down the trail because we thought there might be something going on. That is not enough. By this own court's definition of intentional interference under Bryce v. Buehler, the fact that my client may have created a situation that might have interfered with the arrest of this individual is not enough to sustain a conviction. But here, Your Honor, what we are saying is that Judge Noonan's dissent in Wilfong proves that the Section A1, which is what he was convicted on, is not the section he should have been convicted on. Section A2 is what he should have been convicted on. We're not standing here and saying he's not guilty of a crime. What we're saying is that there's a fundamental right, as Judge Noonan said in his dissent in Wilfong, for a defendant to be convicted of the right crime. Well, I'm delighted that that dissent still resonates. But of course it was a dissent. But, Your Honor, it was a dissent. I was outvoted. But in that case, as Your Honor knows, that case dealt with a forced situation where they did not have Sections A1 and A2 as they did here. And that's exactly what Your Honor said, is that you looked at all the other sections and said, because all these other park provisions have Section A2, failure to obey, that that's the section that, in that case, he should have been convicted of. The Wilfong majority decision does not control this case at all. Your Honor's dissent actually is much more compelling. Even if the dissent was compelling, even if the dissent was law, there are differences between Wilfong and this case. Well, Your Honor, that's why, number one, we cite to the laws of construction for regulatory construction and statutory construction the way to interpret the words in A1. But also we cite to the Buhler and the Bryce case because we don't believe that his acts intended to interfere. They may have created an interference at best, but there's no evidence that they intended to interfere. Counsel, you're down to 43 seconds. Did you want to save that for later? Yes, I will, Your Honor. Thank you. May I please report? My name is Lou Bracco, and I'm an assistant United States attorney. You've got to keep your voice up. Thank you, Your Honor. I'll do my best to do that. How did he interfere? How did he interfere? By going back down the trail after being told that he was not supposed to go back down the trail and contacting the individual. And I think Your Honor was right that it's up to the trier of fact to make the inference as to whether that contact interfered. But I would also submit that just by going back down the trail, he changed the equation and that he took away the prize from the rangers because it forced them then to go back down the trail to make the arrest or to retrieve the other subject. But if he only went back down the trail, counsel would say to you there are two provisions.  But you didn't. You charged him under that provision for interfering. Well, I would agree with Your Honor, and I would say that if he only went back down the trail and went back 50 feet south, then he should be charged under A-2 for failure to obey a lawful order for going back down the trail. But he did, as you pointed out, Your Honor, he did. No, I'm asking a question. Well, the government's position. I guess you haven't made your decision, but it's the government's position. Now we have to decide the case, so we have to ask the hard questions to each side. Now it's your turn. Can I press you a little bit on your testimony? You were the prosecutor of the case, too. Yes, Your Honor. And you asked the ranger, this is your question, at that time Mr. Jacobs fell into an unconscious state. And then the record says inaudible. This is page 10. And then the question is, okay, now, when you say fell into an unconscious state, did you discover whether that was a legitimate unconscious state or what? Answer. About three or four hours, the ambulance did come up. There's no very clear answer that that was fake for three or four hours, is there? Well, I think the record. Look at page 10 and 11 and see. Where does he actually say that he was faking it for the first three or four hours? On page 10 of the transcript, page 12, the defendant's excerpt. Page 10. That's what I was reading. Okay. This is page 10 in the upper corner, but page 12 in the lower right-hand corner, which would be 12 of the. Look at one page. Which page do you want me to look at? Page 12 in the defendant's excerpt of record in the lower right-hand corner. Okay. I asked the question, okay, but he was in conscious. Well, actually, this is Mr. Silver asked the question. He said, okay. Mr. Silver asked that. Right. And he said it came to the medical people's attention that he was faking. Now, that's presumably. What's his say? But. And it's also three or four hours later. But. Well, no, no. It said. The medical people, I assume, are the people of the ambulance, aren't they? Right. But it's the medical people. The witness is testifying that it came to the medical people's attention that he was faking. How could they determine what had happened? That's in the record, Your Honor. If there was an objection to it and it was moved to be stricken. No. Maybe the court would have granted it. No. But consider what the testimony is. The medical people say three or four hours later he's faking. How could that bear on what happened when they weren't there? Well, I take that to mean that the witness is saying that the medical people told him that he was faking at the time. All the time. How would they know that? Well, I don't know. It wasn't. I don't know either. How would anybody know that? Well. You ask for reasonable inferences. Inferences beyond a reasonable doubt. How could the medical people know his state when they were not present? He may have told them. He may have told them. Would you have asked about this? Well, you know, I'm not. I wasn't asking the question, Your Honor. Well, it was in the record. It's a pretty. Well, all right. I won't comment on the examination. You don't really bring out that he was faking at the time. Well, Your Honor, I think the record supports both circumstances. Tell us where. You've got the record. We have it in front of us. Tell us where. Well. Don't say it's your opinion. Tell us where. On page 12, there's testimony in the record which is unobjected to that the medical people determined he was faking. Beyond that. He was faking. Yes. Beyond that testimony, you can still draw the circumstantial inference that when he's hiking up this whole trail and all of a sudden he's contacted by the defendant and only when the Rangers then get to his point, then all of a sudden now he's fainting. So I think the trier of fact can draw the circumstantial, draw the inference that that's pretend. And I would disagree violently with what Mr. Silver said. Not violently, but strenuously. We don't want to be violent. Right. He said that Jacobs had a reason to faint when he saw the Rangers because he knew he had lied to them the night before. But the point that I think I tried to make in my brief is that he had, Jacobs had no way of knowing that the Rangers found out that he gave them false identity unless when Butcher went down the trail, he told them that they were going to arrest him because he had successfully gotten rid of the Rangers the night before. Right. They showed him some identity. They went away. They confiscated some marijuana from some of the other people. And then. So he's fine. So. So Jacobs is fine. He's hiking up the trail and he thinks there's no problem. Neither way do we know because the record doesn't. That's right. The only thing is whether it's a reasonable inference to the trial fact. That's correct. Even if what he said is true, in the view of a third of the court, the trial fact, the question was properly before the trial fact. Let me take you back on page 12 since we're really focusing on that. The question for Mr. Silver is, we will. Did Mr. Jacobs tell you he had hiked many miles to the day before? Is this on page 12, Your Honor? Yeah, in the middle of the page. Did Mr. Jacobs tell you that he hiked many miles? Answer. By the time we got to Mr. Jacobs, he was unconscious. That's the Ranger. And then the question is, you had to revive him. Correct? No, we had to take vital signs. They take vital signs and they don't say, the Ranger doesn't say he's faking. We carried him to the parking lot. And the next question, he was unconscious the whole time? Answer, he was unconscious. The only person who mentions faking is defense counsel. That's what you're hanging your case on? I don't think that, I don't think when he went down the trail and caused the Rangers to have to take other action, once he meets my position as judge, once he has contact, once he has conversation with Jacobs, whether or not Jacobs faints, at that point when he has contact and talks to him and the judge can draw the inference, the trial judge can draw the inference that he warned him, the interference arises at that point. The faking is sort of gravy. You don't have any testimony from the Ranger that he was faking, do you? No, except for what's in the transcript. And that depends on a hearsay report of people who arrived on the scene four hours later. Unobjected hearsay, which is evidence that the trier of fact can consider. And they don't say the way you say it. They say that he was faking, not that he... Judge, I can't dispute what's in the transcript. What's in the transcript? Because we are just stuck with it. Right, but my point is, though, that the interference arises before the faking. Once he has conversation with Jacobs, that's interference right there because the Ranger was afraid that he would go down to warn Jacobs. He didn't want him talking to Jacobs. Butcher knew that he was going to arrest. The Ranger told him he was going to arrest. And he goes down and talks to Jacobs. So whatever he said to Jacobs, at that point, it's interference. Now, if Jacobs had some evidence, he could present evidence to the magistrate, too, so the magistrate could draw a different inference. He elected not to testify. That's his privilege. But don't ask the magistrate. In fact, we tell the magistrate you can't draw any inference from the fact that the defendant didn't testify. So the only inferences that the magistrate was allowed to draw were from the record. And the magistrate obviously drew the inference that Butcher warned him in some way, shape, or form. And I would, one thing, Your Honor, I would like to point out with respect to your dissent because I read your dissent a number of times, and I think I understand it. But I think your dissent was based on the difference between the failure to act in the logging case. And I think what you were saying in that case is you didn't want to hold Will Fong liable for interference because you didn't want to say interference can be based on a failure to act. But here we have something entirely different. This is not a failure to act. This is affirmative action where the defendant consciously disregards the order. He knows it's the Ranger. The Ranger is perfectly willing to let him walk away. And he consciously disregards it and intentionally goes back down the trail, and not a few steps now, a quarter mile down the trail to isolate, to warn Butcher. And I would ask the court, you know, when you say what's the inference the magistrate can draw, the magistrate can draw a lot in a quarter of a mile. This is not a guy who takes two steps down the trail or walks down the trail maybe 50 yards and turns around. He goes down a quarter mile, and he has contact with Jacob. So I think the magistrate can make the inference from that. Thank you, counsel. Thank you. Ribo. I only have 42 seconds. Counsel pointed out the difference between Will Fong. I said to you earlier that there's a difference between this case and Will Fong. He pointed out the difference that I was talking about. Do you agree that there's that difference? I don't agree with that difference, Your Honor. And I would also point the court to United States v. Golden, which is a Third Circuit case where protesters at the Liberty Bell were blocking a police van from getting through. And that's an affirmative stance. They're blocking a police van. And they were only cited under A2, not A1. And the conviction was upheld under A2 as a failure to obey the same thing that we're trying to allege here, that now in that case they didn't talk about A1 because they were only charged with A2. But we believe that case, if you look at the cases dealing with these, is consistent with what happened here. Two quick points. Your Honor, I would cite you to page 9 of the transcript, which is excerpts of record page 11, which talks about how he was taken to the hospital. He was there for three hours. And then, according to the officer, the ranger who identified him at the hospital, when he realized that the rangers weren't going away, he got well. And I think that's where the whole faking issue came out of. And that's on the top of page 9. And as for Your Honor, I again go back to the same thing. The crime is intentional interference. It's a specific intent crime. That has to be proven beyond a reasonable doubt by the government, not by the defense. Even if the court could make an inference, our position is that inference was not beyond a reasonable doubt, considering the totality of the facts in this case. You know what the tragedy of that argument, from your perspective, is? It is a trier of fact who decides what is reasonable. That's what sometimes lawyers forget. I understand that. But it's also the district court's power to say that that inference, because this is not direct evidence, we're talking about an inference, that given the totality of the facts in this case, that inference, whether it was reasonable or not, does not amount to beyond a reasonable doubt to prove a specific intent crime. I'll tell you the reason the issue is so ripe in my mind. I wrote a decision following just what you said, and the Supreme Court reversed it because they said the inference, I said the inference wasn't reasonable. It wasn't, in my view. And the Supreme Court says who decides what is reasonable is a trier of fact. They made the conclusion it was reasonable. Farris, you're just wrong. Your Honor, I'm over my time, but can I just respond one quick? I would ask the court to look at what the magistrate court found, what he said he found, because he didn't make the inference that my client talked to him and therefore warned him. He went off only on walking down the path. Thank you. Thank you. Thank you to both counsel. The case just argued is submitted for discussion.
judges: Farris, Noonan, Rawlinson